## HENRY WILLIS v. THE STATE.

### No. 3169.    Decided December 20, 1905.

**1.—Manslaughter—Refreshing Recollection of Witness—Contradicting Own Witness.**

On a trial for murder, there was no error to refuse defendant to contradict his own witness by reading before the jury his testimony on a previous trial; the witness simply failing to recollect a fact testified to on a previous trial, and the court having permitted counsel for defendant to question the witness in the presence of the jury what his present recollection was as to the point at issue.

**2.—Same—Evidence—Theory of Defense.**

On trial for murder, where defendant had introduced in evidence the written statement of his sister as to mistreatment of her by deceased, there was no error to exclude testimony of other acts and statements made by her of such mistreatment which were not contained in her said written statement, and which were offered by defendant to corroborate the same; it not having been shown that defendant ever knew of said matter offered as testimony.

**3.—Same—Contradiction of Witness—Evidence.**

On a trial for murder, where defendant's father testified that he knew nothing of an attempt at reconciliation between deceased and his wife or the exchange of letters between them, and denied that one M. handed him a letter written by deceased and addressed to the wife of deceased, there was no error in permitting the State to contradict said statement by said M. who testified that he did hand such letter to the witness.

**4.—Same—Bill of Exceptions.**

On trial for murder, where the bill of exceptions taken to the admission of the evidence assigns no reason why the same is objectionable, it cannot be considered on appeal.

**5.—Same—Dying Declaration—Bill of Exceptions.**

Where on trial for murder, the bill of exceptions taken to the introduction of testimony with reference to declarations by the deceased, does not negative the idea that he was then conscious of approaching death and had no hope of recovering, there was no error.

**6.—Same—Credibility of Witness.**

On a trial for murder there was no error for the State to show that one of appellant's witnesses had been charged with the offense of forgery.

**7.—Same—Remarks of the Judge—Practice.**

On a trial for murder, there was no error of the trial judge to state that it was competent for the State to employ private counsel, the court apprehending that there was an attempt to bring said counsel into disrepute with the jury by allusions made by defendant's counsel.

**8.—Same—Bill of Exceptions—Evidence.**

Where on a trial for murder, the bill of exceptions to the introduction of testimony with reference to a difficulty between defendant's brother and the deceased is not sufficiently full so as to advise the court of the error complained of, it could not be considered on appeal.

**9.—Same—Evidence—Book Kept by Grand Jury—Bill of Exceptions.**

On trial for murder, where the question was whether the grand-jury book was accurately kept, and the question was not directed to some witness' testimony, or assailed as to this, and the bill did not show in what respect testimony was not accurately taken down in said book or how it varied upon the particular point, it could not be considered on appeal.

**10.—Same—Conclusion of Witness—Evidence.**

On trial for murder, there was no error in excluding testimony conveying the opinion or conclusions of witness as to who was doing the shooting at the time of the homicide.

**11.—Same—Photograph—Evidence.**

On a trial for murder, there was no error in excluding a picture or photograph of the sister of defendant and wife of the deceased, offered for the purpose of showing the physical condition of said female at or before her marriage with deceased, to wit: that she was healthy, cheerful, innocent and possessed of great beauty; other evidence showing that after five months of married life with deceased, she became a physical wreck by reason of his maltreatment and excesses; and that it was impossible to correctly describe the looks of said female to the extent as shown by said picture; and that appellant had been accustomed to visit this picture and brood over it. See opinion as to rule for the introduction of photograph.

**12.—Same—Manslaughter—Self-Defense.**

See opinion for charges on manslaughter and self-defense held to be applicable to the evidence in the case and presenting no reversible error, and did not require defendant's requested charges on these subjects.

**13.—Same—Charge of Court—Means Used—Gun—Pistol.**

On a trial for murder, where the proof is absolute and beyond controversy that the buck shot fired from the shot gun by defendant inflicted wounds upon deceased which were necessarily fatal upon him, and his cousin, and the evidence also showed that the latter two were prone on the ground when defendant seized the pistol of deceased and fired into him and his cousin; and the firing was so consecutive and so rapid, as to both shot gun and pistol, as to form a continuous transaction, there was no error, although not necessary, for the court to charge on the legal effect of the gun shots and the pistol shots separately.

Appeal from the District Court of Ellis. Tried below before Hon. J. E. Dillard.

Appeal from a conviction of manslaughter; penalty, four years imprisonment in the penitentiary.

A statement of this case will be found in the former opinion of this court, see Willis v. State, 75 S. W. Rep., 790.

*Templeton & Harding,* for appellant.—On question of photograph: 18 Am. and Eng. Enc. of Law, 424; Cowley v. People, 83 N. Y., 464 (38 Am. Rep., 471); M. K. & T. v. Moore, 15 S. W. Rep., 714 (75 Am. St. Rep., 465). On question of legal effect of pistol shots: Spangler v. State, 42 Texas Crim. Rep., 247; Crow v. State, 88 S. W. Rep., 814.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of manslaughter, and his punishment assessed at confinement in the penitentiary for a term of four years; hence this appeal. This is the second appeal. See 75 S. W. Rep., 790. The prosecution there, as here, was for killing Claude Shaw; and the facts proven on this trial are substantially the same proven on the former trial, to which reference is here made.

When A. Patterson (witness for defendant) was on the stand, he was examined as to H. M. Shaw and his three sons coming to his shop in the town of Ennis in 1902. He stated they stopped in front of his place of business and hitched their vehicle. H. M. Shaw came into witness' shop, with a shot gun, and left it there. Something was said about having a case in court; and he stated that the parties then left, and he does not remember seeing any one of them any more that day, until late in the afternoon, when they returned, got the gun, and placed it in the surrey, and left. Witness was then asked if he did not see some of the Shaws hanging around his shop more or less all day. He stated that he did not remember whether he did or not. He was then asked if he had not testified at the February Term of the court, 1903, when this case formerly on trial. Witness answered that he did. He was then again asked whether or not one of the Shaws lingered about his shop during the day. Witness again stated that he did not remember one way or the other. Appellant's counsel then proposed to refresh witness' recollection by reading from his statement at the former trial. The court ordered the jury to be retired, and defendant claimed the right to propound the question in the presence and hearing of the jury. After the retirement, the court permitted defendant to read to the witness what purported to be his testimony at the former trial on the question. It is shown that to one question witness answered, that after leaving the gun there they all went off, but there would be one around there all the time; every now and then he would see one of them around there. After reading this in the presence of the court, appellant then asked witness if it refreshed his recollection on the point inquired about. Witness answered that it did not, that he still had no recollection upon the question one way or the other. Defendant then claimed the right to bring the jury back, and refresh his recollection before the jury by reading his testimony, and asking him the question. This the court would not permit him to do; but he might question the witness in the presence of the jury what his present recollection was if any, as to the point inquired about, and if his memory had been refreshed upon the question, and the jury could hear his said answer. Appellant desired further to ask the question, whether or not he had testified on the former trial that one of the Shaws had remained around near the witness' place of business during the day. The court would not permit this. Appellant says he had a right to pursue this method, for the purpose of refreshing the recollection of the witness, and for the purpose of laying a predicate to contradict him, if he denied making the statement. In this action of the court there was no error.

Appellant had full opportunity to refresh the recollection of his witness, and he was not authorized in this manner to lay a predicate, and then contradict his own witness. Where witness gave no testimony calculated to injure him, but simply failed to recollect a fact, he was not authorized to contradict him.

During the trial, appellant placed Mrs. Nin Willis on the stand, and proposed and could have proven by her, that Lelia Shaw (deceased wife of Jim Shaw, and sister of appellant) a short time before she separated from her husband, came to the house of witness (who was her sister-in-law, and lived nearby) crying, and stated that her husband (Jim Shaw) had choked her and had threatened her life, and that she was afraid of him; and further stated that Jim Shaw had mistreated her, and treated her so cruelly that she did not believe she could live with him any longer. On objection of the State, this testimony was excluded. Appellant insisted that it was admissible, inasmuch as appellant's theory involving mistreatment of Lelia Shaw by Jim Shaw had been attacked by the State; that this testimony was competent to support the theory of the defendant. The court in explaining this bill, says: "That the instance proposed to be proved by the witness was not referred to, nor recorded in the written statement of Lelia Shaw; nor was it claimed or shown that defendant ever knew of said conversation." We think this sufficiently disposes of the matter without further discussion. What is said here is also applicable to the excluded testimony of Mrs. Joe Cave.

Appellant introduced J. C. Willis (father of defendant) and proved by him that he knew nothing of an attempted reconciliation between Jim Shaw and his wife, and the exchange of letters between them, as shown by the records. The State then asked said witness, on cross-examination, if it was not a fact that sometime between the separation of Lelia Shaw, from her husband and her death, one W. W. Montgomery handed to witness a letter written by Jim Shaw and addressed to his wife Lelia. This was objected to on the ground of immateriality, and that it related to matters of which defendant had no knowledge; and if it was offered as a predicate to contradict, was immaterial. Witness answered that said Montgomery did not give him any such letter. Montgomery was then placed on the stand, and over objections of appellant, the State proved by him, that sometime between the separation of Jim Shaw and Lelia Shaw, and her death, witness handed to J. C. Willis (the father of Lelia) a letter written by Jim Shaw, addressed to Lelia. This was objected to on the ground that it proposed to impeach J. C. Willis upon an immaterial point. Appellant seems to have deemed it material in the examination in chief of the witness Willis to show that no attempted reconciliation occurred between Jim Shaw and his wife and no exchange of letters between them occurred. We can see its materiality in one point of view; that is, it was competent for the defendant to prove that Jim Shaw, if he did mistreat his wife while they were living together, never attempted to atone

for it prior to her death, and that she died without any attempt on his part at reconciliation, and that he never wrote any letter to her. Defendant reinforces this idea by showing that no letters passed between them. We believe it was competent to contradict the witness on this point.

The State introduced Rance Pittman as a witness, and proved by him that a short time after the death of Lelia Willis, he met Jack Willis on the streets of Ennis, and that Jack told him that Henry Willis desired him to come up to J. C. Wills' house the next day. This was objected to on the ground that it was prejudicial to defendant; because it was the theory of the State that defendant had been informed of the contents of the written statement of his sister shortly after her death, and that this was shown by the fact that this witness then read the statement: so that the hearsay testimony was especially prejudicial to defendant. Now all we understand by this bill is, that the invitation of Henry Willis to the witness Pittman to come to his father's house the next day, was objected to. No reason whatever is assigned for the invitation. It may be that something occurred the next day at the house of J. C. Willis that was objectionable, but we do not understand the bill to raise this. What occurred at the house the next day is not objected to.

H. M. Shaw was introduced by the State, and testified that he went with his wagon shortly after the shooting for Jim and Claude Shaw, as soon as he learned they were shot; and when he got there he was told by Claude Shaw, in his dying declaration, how the shooting occurred; and after detailing what Claude Shaw said as to how the shooting began, and ended, and what was done by defendant and Jim and Claude Shaw, the State asked the witness, if Claude Shaw said anything else; and if so what was it. Defendant objected to this on the ground that it was irrelevant, hearsay and prejudicial. The court overruled the same, and the witness answered, that Claude Shaw begged him (witness) to knock him in the head. So far as we are advised, this may have been res gestæ. However, we believe it was admissible as a part of the dying declaration. It was necessary for the State to show at the time the statement was made by Claude Shaw, that he was then conscious of approaching death, and had no hope of recovery. The bill does not negative this idea, and we can well see how such testimony would be competent as tending to show that the deceased, Claude, then had no hope of recovery.

It was competent for the State to show that appellant's witness, John Autry, had been charged with the offense of forgery, as going to discredit him.

We believe it was also proper, under the circumstances, to show that Farrar was county attorney on the occasion of the former trial, and represented the State, and show how he came to be employed as he was familiar with the case. Under the circumstances shown by the bill and explanation of the court, we also think the court did not act improp-

erly in stating that it was competent for the State to employ private counsel, who was entitled to all respect and regard in the conduct of the case, as the county attorney. This was justified, as explained by the court, by repeated remarks of appellant's counsel to the effect, that Mr. Farrar was hired counsel in the case. It seems that in the apprehension of the court there was an attempt to bring him into disrepute with the jury by these allusions.

It appears that the State proved that about March 15, 1902, the brother of defendant, Jack Willis, made an assault upon Jim Shaw, one of the parties killed at the time of the killing of Claude Shaw, in the town of Ennis; and that when Jim Shaw returned home that evening, he had a gash cut in his head. This was objected to on the ground that it was a fight between other parties, and the defendant had no connection therewith and was not present at the time; that said testimony was prejudicial to his rights. It will be noted that the bill does not certify as a fact to the environments of the case, showing that it was a fight between Jack Willis and Jim Shaw, in which appellant had no connection, and when he was not present. This is merely urged as a ground of objection to the admission of the testimony. If the environments were fully stated, it might appear that the testimony was admissible; or on the contrary that it was inadmissible. The bill should be so full as to advise the court of the error complained of. It has been frequently held that a ground of objection stated to the admission of testimony is not a certificate of the judge that such was the fact.

We do not think it was competent to prove, in the way attempted by appellant, that the grand-jury book was not accurately kept, and did not accurately show the testimony taken down. If the question had been as to the accuracy of some witness' testimony, and the grand-jury book had been assailed as to this, of course this matter could have been gone into. If the witness had been attacked, the bill should have shown in what respect this testimony was not accurately taken down, and if this testimony varied from the book upon the particular point, the book might have been attacked in that respect.

Appellant insists that the court erred in this connection with regard to the testimony of the witness Raymond Jackson. It seems that after this witness was examined in chief by the State, and showed that he was two hundred yards from the scene of the homicide, and that he looked in that direction soon after the first shot was fired, and in his opinion there were from five to eight shots fired, that he could see three men in the road, and could see the smoke and heard the reports of a gun and pistol. On cross-examination he was asked if it was not a fact that after he looked around and saw the shooting, that he saw puffs of smoke coming from each side; that is, from the Shaw boys on one side and the defendant on the other. Witness answered that he could not say that he did. Witness was then asked by defendant's counsel, that as he looked upon the shooting at the time and saw it going on, did he

then think that both sides were doing the shooting, judging from what he saw at the time. The State objected to this on the ground that he the witness could not state what he thought, same being only a conclusion, and he could only state what he knew and saw and heard. The court sustained this objection. It is urged by counsel for appellant that it was competent to prove the impression on the mind of the witness as to this matter, and what he thought was but another way of getting out his impression. If it was the witness' best impression from what he saw, counsel could have very easily asked this question. The witness had previously answered definitely that he could not state he saw smoke coming from the Shaw boys on the one side and defendant on the other. Besides, it is not shown by the bill of exceptions what the answer of the witness would have been to this question. It is merely stated that the witness was not permitted to answer the question.

During the progress of the trial, appellant proposed to introduce in evidence a picture or photograph of Lelia Willis (sister of defendant), the same being about 20x24 inches, large size, showing head, face, shoulders and bust. It seems that testimony had already been introduced showing the physical condition, etc., of Lelia Willis, at or before her marriage with Jim Shaw; and it was insisted by appellant that this testimony was admissible to supplement such testimony, to show that said Lelia was healthy, cheerful, innocent, and possessed of great beauty; and that after five months of married life with Jim Shaw, she became a physical wreck by reason of his maltreatment and excesses; that it was impossible to correctly describe the looks of said Lelia Willis, to the extent as shown by said picture. It is also stated in this connection as a fact, that appellant had been accustomed to visit this picture and brood over it, and seemed to be greatly affected; that he was greatly attached to his sister, etc. This testimony was offered in order that the jury might try it from his own standpoint, and determine the circumstances, at least the existence or not of adequate cause, and the condition of the mind of the defendant, both at the time of the homicide, and just before, and the cause of producing the same. The court sustained the State's objection, and would not permit the picture to be introduced. Of course, sometimes pictures or photographs are competent evidence, but not always so. If a picture or photograph of the scene of the homicide would serve to illustrate any fact, as the locality where some particular act occurred, such photograph would be admissible. As said by an Oregon authority (State v. Miller, 43 Ore., 325), photographs may be used to identify persons, places and things; to exhibit particular localities or places, where it is important that the jury should have a clear idea thereof, and the situation may thus be better indicated than by testimony of witnesses; or where they will conduce to a better or clearer understanding of such testimony. And they may be also employed to detect forgeries and to prove documents where the originals cannot be readily produced. The authorities on this subject

are not always reconcilable, some of them going to a greater extent than others. But we believe it is conceded by all that where the photograph is not necessary to illustrate or make clear any question, but on the other hand would be calculated to prejudice or inflame the minds of the jury, that such evidence is not admissible. Sometimes in prosecutions for murder, the location of the wounds can be shown by photographs. Franklin v. State, 69 Ga., 36. In State v. Miller, supra, it was held erroneous to admit a photograph which did not accurately reproduce the appearance of the wounds, and which presented a gruesome spectacle of a disfigured and mangled corpse, very well calculated to arouse indignation in the jury. In Cirello v. Metropolitan Exp. Co., 88 N. Y. Supp., 932, it is held generally, it is true not only in a criminal prosecution but civil actions for personal injuries, that a photograph is inadmissible when it is neither necessary nor instructive, and is offered merely for the purpose of inflaming the sympathies of the jury. Fore v. State, 75 Miss., 727. As stated, a number of authorities can be found going beyond this, and perhaps supporting the view of appellant's counsel, though we do not believe any authority can be found going to the extent of holding, where a full opportunity was given to prove the facts here involved, to wit: the appearance as to health, strength and physical development of a person, the case should be reversed because, in addition thereto a photograph or picture of the person was not permitted to be introduced. In this particular case appellant had full opportunity and did prove the condition of Lelia Shaw as to her personal appearance, physical condition and development, age, etc. We think under the circumstances, the introduction of the picture of a beautiful woman, as Lelia Shaw was described to be, and the fact that appellant was accustomed to visit her picture and brood over it, would be a matter calculated to distract the attention of the jury from the main issues in the case. Therefore, we hold that the court did not err in refusing its admission.

The court charged on murder in the second degree, on manslaughter and on self-defense. Appellant criticises the charges on manslaughter and self-defense. The jury found appellant guilty of manslaughter, and assessed his punishment at four years confinement in the penitentiary. Appellant concedes if the jury had inflicted the lowest punishment for manslaughter, the error of the court in the charge on manslaughter might be harmless, but he attributes the excessive punishment in some way to the erroneous charge on manslaughter. He insists that the court coupled a number of things conjunctively in the charge on manslaughter, and that the jury were required to believe all of them, before they were authorized to convict of manslaughter. This increased appellant's burden, and somehow mislead the jury to inflict a greater punishment on appellant than if the charge had been submitted in a different form. He says that the charge of the court required the jury to believe that Lelia Shaw, before her death, informed defendant in a general way that Jim Shaw had used insulting con-

duct towards her, and that defendant was not informed of any insult-
ing conduct described in said statement, except that contained in the
first two pages, until two or three weeks before the homicide; and
further the jury were required to believe that three or four weeks
prior to the homicide defendant met Claude Shaw and Jim Shaw in
the road, and that at that time he had not been informed of the sev-
eral acts of insulting conduct on the part of Jim Shaw towards Lelia,
and that both Jim Shaw and Claude Shaw, then used insulting lan-
guage towards him, and in his presence and hearing, and that Claude
Shaw further stated to him that they had read the book; and the
jury were further required to believe that Claude Shaw ratified and ap-
proved the several insulting acts and words of Jim Shaw toward Lelia
Shaw, as set forth in said printed book; and that he (Claude) was
acting with Jim Shaw and siding with him; and that after this meet-
ing in the road, appellant had read the entire written statement for
the first time, and had never been informed of the several insulting
acts, etc.; and further that the killing took place on the first meeting
thereafter; and that the mind of the defendant was in a sudden trans-
port of passion, by reason of these several things, and that defendant
got his information by reading said written statement. And further,
that if the killing took place with all these facts and conditions exist-
ing, and there was no self-defense, then the offense would be man-
slaughter. Now, the proof showed, according to appellant's testimony,
that he did not know what the book contained except the first two
pages, which he had read before; and that the first meeting with Jim
and Claude Shaw occurred after he had read the book. Now, if de-
fendant was informed of things not in the book, as of an assault before,
it does not occur to us that having met the parties since he had ac-
quired said information, that this would be adequate cause. For the
court did tell the jury, that they could recur to such matters as occurred
before to reinforce what appellant learned from the book, and they
could legitimately use what appellant knew before, and under any
state of case, it occurs to us, that was the only use to which appel-
lant could put such information, and the jury were so instructed.
Great stress is laid on the fact that the jury were required to believe
that Claude Shaw ratified and approved what Jim Shaw did. It
occurs to us that this contention is but a play upon words. From
appellant's theory, as we gather from this record, his contention
throughout is, that the parties were acting together, and that Claude
Shaw sided with Jim Shaw, and even took the lead after Jim came
back in the neighborhood. If this was not approving Jim Shaw's
conduct and acts in the matter, we would like to know what it could
be. It is also urged that the jury were required to believe that at the
meeting between appellant and Claude and Jim Shaw some two weeks
before the homicide, both Jim and Claude used insulting language
to appellant. Now, if these parties were acting together, it occurs
to us that what one said or did, the other was saying or doing; and

if Claude Shaw told appellant that they had read the book written by his sister, and there was not a Willis who dared to take it up, and Jim Shaw was present at the time (as the record shows he was) it was the language and conduct of Jim about whom the book had been written, as well as Claude. We do not think the charge, if it be conceded that in some respects it was erroneous contains such errors as were calculated to confuse or mislead the jury, or such as would require a reversal. With this view of the case, we do not believe appellant's requested charge on the subject was required.

Appellant's requested special instruction is, as follows: "If the jury believed that Henry Willis read the written statement in evidence; that he believed the same to be true, and that the meeting in the road on the day of the homicide was the first meeting after defendant had read and learned of the contents of said statement, and that Claude Shaw knew of said statement, and had declared his intention to stand with and for Jim Shaw in regard to the same; and that when the parties met on the day of the homicide, the mind of the defendant, on account thereof, and under all the circumstances, viewed in the light of the previous difficulties and from the standpoint of the defendant, was incapable of cool reflection, and that he shot and killed Claude Shaw under such circumstances, then the offense would be manslaughter." It seems to us that the charge of the court as given, covered this same ground, and more elaborately than the requested charge.

Appellant says that the charge of the court on self-defense is erroneous, especially that part of it wherein the jury are instructed, that if Jim and Claude Shaw, or either, unlawfully assaulted defendant with a deadly weapon, then the law presumes they intended to take his life. Appellant says, that the evidence is, that Claude Shaw first drew his pistol from his pocket, and raised it up by his side, and that defendant in anticipation of an assault, fired the shotgun, etc. In other words, technically it cannot be said that at the time the defendant fired his gun Claude Shaw had made an unlawful assault; or at most he was about to do so. And in this connection that the court should have given the special instruction asked by defendant, to the effect that if Jim or Claude Shaw were armed at the time they were killed, and either made or attempted to make an attack upon defendant with a weapon and by the manner of its use was calculated to produce death or serious bodily harm, then the law presumes the intent to murder, etc. It does not appear to us that the charge is too restrictive, inasmuch as it authorized appellant to kill Claude Shaw, if either he or Jim Shaw did any act or acts, or made any demonstration which under the circumstances reasonably caused defendant to believe, viewed from his standpoint at the time, that said Claude and Jim Shaw, or either of them, was about to take his life or inflict upon him serious bodily injury. In such case, the jury were authorized to acquit. Following this, the jury were further told

that if Jim Shaw, or Claude Shaw, or either of them unlawfully assaulted defendant with a deadly weapon, just before or at the time of the homicide, then the law presumes that they intended to take the life of appellant, or inflict upon him serious bodily injury. This charge was given in connection with that which preceded, and the jury in that were distinctly told that if any demonstration was made or act done which reasonably caused appellant to believe his life was in danger or his person in danger of serious bodily injury, he could act, etc. They would understand from this what the court meant in a subsequent charge by "unlawfully assaulted defendant with a deadly weapon." That is, if any demonstration was made with a deadly weapon by either of said parties, appellant was authorized to act. The language of the statute is, when the homicide takes place to prevent murder, etc., if the weapon be such as would be calculated to produce that result, it is to be presumed that the person so using the same designed to inflict the injury. We do not understand the language used to be materially variant from that contained in the statute.

There is a good deal of criticism with reference to the court's charge in case they believed the death was caused or hastened by the use of a pistol. The charge on this subject is quite lengthy, and there may be some portions of the same subject to criticism. But taken as a whole we do not believe it was calculated to have confused or misled the jury. The facts are that the difficulty was continuous from the time it began until it ended, and only required but a few seconds. As soon as appellant met the parties he began firing. According to his testimony, he first shot Claude down, whom he says was making some sort of demonstration as if to get his pistol, or use his pistol, and then turned with his gun and shot Jim Shaw with the other barrel. Both parties were prone on the ground, according to the testimony of others, as well as appellant, neither having fired a shot. He at once seized the pistol of Claude and according to the testimony of the State's witness was seen stooping over the parties firing his pistol into them. According to his own testimony, he was afraid they had another pistol and he shot Jim, and then shot Claude with a pistol. He fired two shots into Jim Shaw, and one into Claude. Claude, in his dying declaration, does not state that he shot him, but tells about his taking the pistol and shooting Jim, as he lay on the ground. Now, it occurs to us that it would be purely speculative and serve no useful purpose to try to sever this shooting with the gun and pistol. If appellant was justified at all, it was at the beginning of the difficulty. But the evidence is that the shotgun wounds inflicted on both Jim and Claude were necessarily fatal. Jim died almost immediately and Claude lived only ten or fifteen minutes at the outside. It occurs to us that there is no testimony which tends to show in any tangible way that the pistol shots hastened the demise of either. Perhaps the pistol shots might have been fatal. About

this we believe the proof is not clear; but the proof is absolutely beyond controversy, that the buck-shot fired from the shotgun inflicted wounds which were necessarily fatal upon both of the said parties. This firing was so consecutive and so rapid, as to both shotgun and pistol, that we do not believe it was necessary for the court to have charged upon this phase of the case at all. The charges on this subject, taken as a whole, were not misleading.

As to the criticism that the jury might have believed that the charge required them to believe that defendant was justified in shooting both Claude and Jim Shaw, there may be one expression in the charge that would seem to bear this construction; but the charge taken as a whole will not confirm this. Moreover, we believe from this record that if appellant was justified in shooting one of said parties, he was equally justified in shooting the other. We do not believe that the evidence here shows that he was justified in shooting either of said parties, either with a shotgun or pistol. While the court was not required to sever in the charge the shooting with the shotgun and pistol, yet it does not occur to us that, as presented, appellant can complain of the same. In fact, it was beneficial to appellant. Furthermore, we think this phase of the case was sufficiently presented to the jury and the special instructions requested, were not required.

There being no error in the record, the judgment is affirmed.

*Affirmed.*