JOHN BOYCE v. THE STATE.

No. 1108.  Decided April 12, 1911.

Rehearing Denied May 17, 1911.

**1.—Murder—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence showed a premeditated killing, the conviction of murder in the first degree assessing the death penalty was sustained.

**2.—Same—Affidavits—Practice on Appeal.**

Ex parte affidavits secured after adjournment of the court, filed either by the State or defendant, can not be considered on appeal.

**3.—Same—Evidence.**

Where the rejected testimony with reference to the passion of deceased could not have affected the verdict in the face of the testimony adduced by the State, there was no error.

**4.—Same—Argument of Counsel—Bills of Exception.**

Where appellant's complaint to the remarks of the State's counsel were not reserved by bills of exception or special instructions, the same .can not be reviewed on appeal.

**5.—Same—Newly Discovered Evidence.**

Where the alleged newly discovered evidence was entirely immaterial to the issue of the case, there was no error in overruling a motion for new trial.

Appeal from the District Court of McLennan.  Tried below before the Hon. Richard I. Munroe.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*G. C. Clegg* and *Quitman Finlay* and *W. H. Forrester,* for appellant.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant in this case was convicted of murder in the first degree and his punishment assessed at death.

The evidence for the State showed that on the afternoon of the killing appellant went to a hardware store and represented that he was going to a picnic and rented a gun.  He purchased five cartridges. This took place a short time before the killing.  He went to the home

of deceased, with whose mother he had been rooming. The mother testified that she had notified him that day to change his rooming place, because her daughter (deceased) had told her that defendant had tried to break into her room that morning before daylight. It does not appear that there were any harsh words spoken at the residence. As to the scene of the killing, we will let the witness Marks tell it in his own way. He says: "I knew Jessie Davis before she was killed. I have been knowing her about five months. I have been knowing John Boyce about three or four months. I was with Jessie Davis at the time she was killed. I met up with her the afternoon before the killing about—between six and seven o'clock. I met her at the house, at her home, at Ninth and Mary Streets. Dave Johnson and Letha Long and her mother and John were up there, besides Jessie and myself. When I first saw Jessie at her home that afternoon she was dressing to go to a masquerade ball. I left the house with her. I was with her, Dave was with Letha; we four left the house together. I saw John before we left the house. When I saw him he was standing on the gallery. He came in the back part of the house. I was in the front of the house, on the front porch. He was standing on the front porch when we left the house.

"The next time I saw John he was down there on Eighth Street with a gun. Jessie was killed on Eighth and Mary. When we first saw John on Eighth Street we were right by Mr. Cameron's business on Eighth Street, on the sidewalk. John came from on the other side of the street, from up towards Franklin Street. He had not passed us anywhere on Mary Street from the time we left the home until we saw him there. He had gone up Ninth Street and come down Franklin Street, and then down Eighth Street. He would have to make three blocks while we were making one. When I first saw John he had a gun. It was a Winchester. When he walked up with his gun, he walked up and presented his gun; I mean that he put his gun in shooting position. That is what I mean by presenting the gun. All four of us were right close to him when he presented the gun in shooting position. I do not know exactly how far he was from us. I guess it was about twenty-five feet—something in that neighborhood, I guess. He was out in the street at that time; we were on the sidewalk. He was still going. He was going fast. I did not hear him say anything, only he said, 'You had just as well come out from behind there; I am going to kill you.' He was talking to Jessie. He called her 'Coon.' He said, 'Coon, you just as well come out from behind there, because I am going to kill you.' She was behind all of us. Dave was behind me, and Letha was behind Dave, and Jessie was behind Letha. I was in front of them all, Jessie was behind us all. When he said that he presented his gun at her, and was motioning it one way and then the other. I stepped out on the sidewalk and started towards him there, and he pointed the gun towards me, and I turned around. He did not say anything. I got out of the way. The rest of them were all right there. The girls were

halloaing. They were clinging close together, and finally they broke apart. They were holding one another. When they were holding one another Jessie was behind Letha, with reference to John. They then broke loose. When they broke loose Jessie turned and ran right down the street. John threw up the gun and fired, and she kept running, and he kept shooting until he downed her. Before he shot she said, 'John, don't shoot me.' She was screaming. She was running from John when he first shot. When he shot the first time she was running from him. When he shot the next time she was still running. She fell at the third shot. When she fell she was right between the railroad track and the street-car track at Eighth and Mary Streets. He was running after her, and after she fell he ran a little by her, and he stopped, and turned around and threw the gun down on her and shot her again after she fell. He shot her through the head. She was down. She was not saying anything to him. He shot her in this part of the head. He then threw the gun down across her legs and tore out up the street."

Dave Johnson and Letha Long corroborate this witness in the essential particulars. They are the only witnesses present at the time of the killing. It was shown that he fled from Waco and was arrested in Caldwell County a few days thereafter.

The appellant introduced no testimony except that prior to this killing he had borne a good reputation. This was not contested by the State. The defendant also undertook to show that defendant and deceased were criminally intimate; that deceased had been his woman, and he was angry because she was going to a place of ill-repute.

Admit this all to be true, it did not authorize him to go and rent a gun, hunt her up and kill her while she was fleeing, begging for her life. The testimony shows a premeditated killing, and the evidence is sufficient to sustain the verdict.

The appellant, in four bills of exception, complains of the refusal of the court to admit certain testimony. The affidavits of the witnesses, by whom this testimony it is alleged it was expected to be proven, are incorporated in the record, and they swear that they would not have so testified, but would have testified to the contrary. While this proceeding is a little irregular, we can not say, in the condition of the record, that this was error.

Appellant also complains of the remarks of the county attorney in his closing argument, in his motion for a new trial. Appellant reserved no bills of exception, the first mention being in the motion for new trial, and requested no special instructions in regard to this matter. In the absence of a bill of exceptions, or some showing that the language was used by the county attorney, we can not review this matter. It has been the unvarying rule of this court that advantage of improper argument can not be taken for the first time in a motion for a new trial. (Rucker v. State, 7 Texas Crim. App., 549; Watson v. State, 28 Texas Crim. App., 34; Harvey v. State, 35 Texas Crim.

Rep., 545; Steinhauser v. State, 48 S. W. Rep., 506.) In this case the matter only appears in the motion for a new trial, and is not verified by a bill of exceptions and in no other manner.

In the motion for a new trial newly-discovered evidence is alleged. If everything the witnesses say they would testify to was in evidence, it would not and could not affect the verdict. They do not claim to have been present at the scene of the homicide, but say that some time prior thereto the relations of defendant and deceased were improper. Admit this is true, it would not authorize defendant to shoot her down while she was begging for her life, nor reduce the offense below murder of the first degree.

The judgment is affirmed.

*Affirmed.*

### ON REHEARING.

#### May 17, 1911.

HARPER, JUDGE.—At a former day of this term this case was affirmed, and appellant has filed a motion for a rehearing, insisting that the court should not consider the affidavits secured after the adjournment of court, and incorporated in the qualifications of the judge to the bills of exception. In the original opinion we' said this was improper, and in passing on this case and the bills we did not take into consideration the affidavits secured after the adjournment of the court. But apparently we did not make our meaning sufficiently clear, and we add this to say this court will not consider ex parte affidavits, secured after adjournment of court, filed either by the State or defendant. On appeal we consider the case in the record as made in the trial of the case and on the motion filed in the case.

Under our view of this case, it was immaterial where deceased was going at the time she was killed. The testimony showed that the last conversation appellant had with deceased was in the morning, except to ask for his clothes that evening, which was pleasantly answered. About five o'clock he had gone to a hardware store, rented a gun and bought shells loaded with buck-shot. He had then gone to the home of deceased, hiding the gun behind the house. When deceased left her home, dressed to go to a dance, appellant went out of the house the back way, got his gun, walked three blocks while deceased went one block, came to where she was with the gun leveled on her, and when she jumped behind her companion he said, "Come out, Coon, I am going to kill you." Deceased begged him not to do so; he run her— shot her while fleeing, screaming and begging for her life. When she fell he was running so fast he ran past his victim, checked up, walked back to her, and to be sure that he killed her, placed the gun to her head and fired again, threw the gun down and fled the country, being captured three days later in Caldwell County.

This is the testimony, and all the testimony, and if there was any act or circumstance in deceased's conduct to create passion in defend-

ant's mind it must have been in the 'morning, for certainly nothing took place in the evening when they met, according to all the witnesses, to have excited him. Getting the gun at five o'clock, hiding it in the back yard, shows a preconceived design to kill, and then the circumstances of the killing, shows an absolute reckless disregard of human life.

In the testimony, failing to find any fact that would reduce the killing below murder of the first degree, the motion is overruled.

*Overruled.*