SAMUEL B. GIBSON V. STATE.

No. 24407. June 15, 1949.
Rehearing Denied October 26, 1949.

*A. Mack Rodgers* and *William E. Greenlees,* Big Spring, for appellant.

*George P. Blackburn,* State's Attorney, Austin, for the state.

KRUEGER, Judge.

The offense is murder. The punishment assessed is death.

The state's evidence, briefly stated, shows that on the night of the 6th day of November, 1948, appellant entered the home of Juan Olague where the deceased, a boy about fifteen years of age, was asleep on a bed and stabbed him several times with a dagger, inflicting fatal wounds from the effects of which death resulted in a very short time. A little girl who had gone to the house to borrow some matches saw appellant in the house with the dagger in his hand and heard the boy say, "Please don't hit me no more." She ran to Fabian Gomez's cafe and informed him of what she had observed. Gomez called some officers who were near his cafe where a dance was in progress. When the officers arrived at the home of Juan Olague, appellant was in the act of coming out; but when he noticed the officers, he ran back into the house. One of the officers followed him into the house and then appellant jumped through an open window pulling the screen from the window as he went out. Two of the officers who were on the outside grabbed appellant, took the dagger away from him and carried him to jail. An investigation made by one of the officers and Mr. Gomez disclosed the body of the deceased lying on the bed and covered completely with old quilts. The investigation also disclosed that the house had been ransacked. Appellant made a confession in which he admitted that he entered the house by himself on the night in question; that he

had consumed a considerable quantity of intoxicating liquor on the afternoon up to a short time before he entered the house; that he did not remember stabbing the boy, but that he must have done so since no one else was in the house with him. At the time the officers apprehended him, he had the dagger in his hand and it had blood on it; his clothes also had blood on them. Thus it will be noted that the proof conclusively shows that he committed the offense. His only excuse for the brutal murder was that he was intoxicated.

The only complaints brought forward are embraced in his motion for a new trial wherein he, for the first time, complains of certain remarks made by the district attorney in his closing argument to the jury. No objection seems to have been urged to the argument complained of at the time it was made. The first time the court heard of the complaint was in appellant's motion for a new trial. It is the settled law of this state that it is too late to complain of argument for the first time in a motion for a new trial. An objection should be addressed thereto at the time it is made. See Rucker v. State, 7 Tex. App. 549; Watson v. State, 28 Tex. App. 34 (12 S. W. 404); Harvey v. State, 35 Tex. Cr. R. 545 (34 S. W. 623); Boyce v. State, 62 Tex. Cr. R. 374 (137 S. W. 116); and many other cases might be cited.

His next complaint in the motion is misconduct on the part of the jury, in this: that the jury in determining whether to assess his punishment at death or imprisonment in the penitentiary for life, they took into consideration the possibility that if he were given less than death, he might receive a pardon in future years and be released to again prey on society. The court heard the evidence of some of the jurors relative thereto. Appellant called six of the jurors to testify on his motion. Mr. H. O. Phillips, one of the jurors who sat in the case, testified, in substance, as follows: The jury sent a note to the district judge in which they asked that in case they assessed the defendant's punishment at imprisonment for life could he be pardoned or would he have to serve his full time; the note was returned and destroyed; that he did not know why the note was sent to the judge. I expect we considered the possibility that he would receive a pardon, although I won't say we did or didn't.

Mr. Hughes, one of the jurors, testified, in substance, as follows: Our first vote, after our vote of guilty, was, the best I remember, seven for life and five for the death penalty. There was some discussion by the jurors as to whether the defendant would be given a pardon by the governor if he were

given a life sentence; some of them just wondered if he wouldn't—couldn't be—pardoned, following this the note was sent to the judge. The judge replied that he could not answer that question. I think I said that I read in a newspaper where it had been done. I do not know of any statement made by other jurors.

Mr. Norris testified, in substance, as did Mr. Hughes but in addition thereto testified that the jurors talked awhile about giving defendant a life sentence and also discussed giving him the death penalty, but some one said if he was given life that he could be given a pardon and be out on the public again.

Jurors Potts and Pierce testified that after retiring and selecting a foreman they voted on his guilt and then they voted on the punishment to be assessed. On the first ballot is was seven for life and five for death. On the second, it was just the reverse, however, as time went on, they switched back and forth. Their recollection was that after the discussion of a possibility of a pardon they stood nine for the death penalty and three for life imprisonment. This is, in substance, the testimony developed on the hearing. The court overruled the motion and he excepted to the ruling of the court. The question of whether or not some governor may at some future time pardon appellant was a mere conjecture. It was purely speculative on the part of the jury. No one could know what some governor may or may not do. We think the case falls within the rule announced in the case of Henderson v. State, 132 Tex. Cr. R. 596 (106 S. W. 2d 291). See also Todd v. State, 93 Tex. Cr. R. 553 (248 S. W. 695); and Prater v. State, 131 Tex. Cr. R. 35 (95 S. W. 2d 971).

No reversible error appearing from the record, the judgment of the trial court is affirmed.

Opinion approved by the court.

### ON MOTION FOR REHEARING.

GRAVES, Judge.

Appellant's attorney, in oral argument before us, stresses the fact of the introduction of two pictures of the deceased's body, claiming the same to have been inflammatory and probably causing the jury to render a verdict of death. He lays down the recognized doctrine relative to the presence before the jury

of bloody clothing and such admissibility in evidence, such being "only when the introduction serves to illustrate some point or solve some question, or serves to throw light upon the matter connected with the proper solution of the case, and under no other circumstances; but whenever the introduction of such clothing would, in the light of the whole case, aid the jury in arriving at the very truth of the matter, the court should not hesitate to admit its production and exhibition." Branch's Ann. Tex. P. C., p. 1031, sec. 1855.

It is a further recognized doctrine that if the presence of such in evidence would thus aid the jury, the gruesomeness of the proffered article should not prohibit its introduction. See 18 Tex. Jur. p. 339, sec. 209; Trigg v. State, 99 Tex. Cr. R. 376, 269 S. W. 782.

In the case of Young v. State, 49 Tex. Cr. R. 207, 92 S. W. 841, a death penalty, the accused was charged with causing the death of a 16-year-old girl "by beating, bruising and wounding her with a blacksnake whip and stick and a hoe, and a hoe-handle, and a rock and a plank and a board and a rope, and by kicking her with his foot and by stamping her with his foot, and by choking her with his hands." A photograph of this bruised and beaten body was offered, and we there held:

"Bill number 13 shows that appellant objected to the introduction by the State of the photographs taken of deceased after her death. The grounds of objection being that the pictures were not true representations of the girls, and were not taken until after certain operations had been performed upon her by the attending physicians. These objections are not certified by the court as facts. If the pictures were true representations, or measurably true representations of the condition of the body of deceased after death, we know of no rule of law that would exclude their admission as testimony. If they were not true or measurably true representations at least, they should not have been introduced; but in the shape the bill is presented to us, there is nothing therein showing that the same were not correct photographs, except appellant's objections. The grounds of objection are not certificates of the judge that such were facts."

In the present case, the objection to the two pictures of the deceased boy reads as follows:

"The introduction in evidence of the said photographs was objected to by the defendant at the time they were offered in

evidence, upon the following grounds, to wit: No proper predicate had been laid to introduce the photographs in evidence, since their authenticity had not been properly shown and established; the witness Bruton, called by the State to identify and to vouch for the authenticity of the photographs, said that he did not take the photographs, that he did not develop the photographs from their negatives, and he did not say that he was present when they were developed and printed by the photographer who was alleged to have made the photographs. The photographer alleged to have taken the photographs should be called to the stand to identify and vouch for the authenticity of the photographs."

It will thus be noted that the objection went only to a verification of the fact that the photographs correctly portrayed the matter which they were supposed to reflect. This objection was fully met by the testimony of J. B. Bruton, county juvenile officer, who was present when the pictures were taken, who superintended such taking, and certified to their correct reflection of the condition of the deceased's body.

Appellant entered a plea of not guilty to a charge of murder with malice, and in a written statement he claimed that on account of his excessive drinking of intoxicating liquor, he had no recollection of the matter other than that he found himself in this house asking for whisky; that he did not remember if he searched the house, or obtained this knife there, or that he stabbed the boy to death. He did remember the chief of police coming into the house and his subsequent capture.

In his testimony upon the witness stand, appellant details his different movements on the night of the homicide, his different purchases and drinking of liquors, but does not remember anything relative to going into this house and the killing of this boy. In one sentence he denies killing this boy, and immediately thereafter he asks his questioner: "How do I know whether I stabbed him or not since I say I don't remember? * * * But one thing I said, "If I am found guilty of these things, I wish to suffer the punishment." We quote him as follows:

"Well, a fellow that has committed a crime has a bad conscience. What I mean by that, you know, he all the time can't be still; at night when he lays down he can't sleep for dreaming bad things, and all such as that. I feel I did not commit that crime, and the reason I feel I didn't commit it is because I don't have any guilty conscience. I previously testified I do

not have a criminal record. This is the first time I have been in court for a crime like this. I still feel that if I actually committed this crime I ought to be punished for it."

Again, on cross-examination, he testified:

"With reference to my excuse to this jury being that I just don't remember what happened over there and don't know whether I killed this boy or not, I am not excusing myself; no, under that knowledge, but to the best of my memory I can gather I didn't kill him. What I am talking about is, the reason I say I didn't kill him is because my conscience doesn't hurt me. A fellow that has murdered some one hasn't got any peace but a fellow with a clean conscience, knowing he hasn't done anything, can sleep and not be bothered, and I tell the jury my conscience is clean and I can sleep."

Under this testimony and appellant's plea of not guilty and the indictment herein, it was necessary that the jury not only should be enlightened upon the actual killing, but also upon the question of malice; and the manner of the commission of the offense oftentimes has great weight in determining the existence or non-existence of malice; the ferocity of an assault oftentimes has weight in such determination. The attending physician described the wounds upon the boy's body, speaking evidently from the photographs, as eight or ten wounds entering from the back, and one or two thereof ranging completely through the body, and the evident death of the deceased was caused by a massive loss of blood from these wounds. The pictures evidenced the fact of nine or ten wounds in an area of but a few inches, all but one being on the left side of the back near the shoulder blade, each having a separate point of entry and reflecting a separate stroke, and all together causing a massive hemorrhage and death. We think the condition evidenced by the photographs was useful to the jury in not only determining an intent to kill, but also the malice, if any, was shown; and photographs have always been held admissible provided they serve to illustrate any necessary point in the cause. See Willis v. State, 49 Tex. Cr. R. 139, 90 S. W. 1100.

We are impressed with the inadequacy of the objection leveled at these photographs. Their authenticity and their accuracy were shown by the person who was present and superintended their taking; and nothing was said in such objection relative to the possible inflammatory effect upon the minds of the jury. A true depiction of a surrounding scene or other pertinent matter that might aid the jury in the determination of ques-

tions submitted to them has often been held admissible, even in death penalty cases. See Powell v. State, 50 Tex. Cr. R. 592, 99 S. W. 1005; Gibson v. State, 53 Tex. Cr. R. 349, 110 S. W. 41, both death penalty cases; see also Willis v. State, supra, and Young v. State, supra.

In Franklin v. State, 69 Ga. 36, 47 Amer. Rep. 748, it was held:

"A photograph of the wound of the deceased was admitted as evidence over the objection of defendant. The throat of deceased was cut; the character of the wound was important to elucidate the issue; the man was killed and buried, and a description of the cut by witnesses must have been resorted to; we cannot conceive of a more impartial and truthful witness than the sun, as its light stamps and seals the similitude of the wound on the photograph put before the jury; it would be more accurate than the memory of witnesses, and as the object of all evidence is to show the truth, why should not this dumb witness show it? Usually the photograph is introduced to prove identity of person, but why not to show the character of the wound? In either case it is evidence; it throws light on the issue. 1 Bish. Crim. Proc., 1097; Wharton's Crim. Ev., 544, and cases cited in both texts."

The second point offered herein relates to the fact of claimed misconduct upon the part of the jury in that one of the jurors made the statement that he had once read in a newspaper where a man was pardoned from the penitentiary who was serving a life term therein. The effect of such a statement is alleged in this motion to have caused the appellant to receive the extreme penalty. Evidently the jury in their discussion seemed to intend that appellant should never again be allowed to be enlarged in freedom, and they made a request of the trial court as to whether one sentenced to prison for life could ever be pardoned. This inquiry the court correctly refused to answer. See Moore v. State, 213 S. W. (2d) 844, and cases there cited. The jurors were without guidance in such matter, but were called upon to decide the question of punishment upon their own ideas as to what would be an adequate one. Unquestionably, they would be expected to act therein as the judgment of each could be fairly blended into the judgment of all in a unanimous verdict, and such action had to carry with it many matters of common knowledge, as well as other matters that make up the personal equation of each separate juror in his outlook and understanding of life and its problems. One of these jurors made the statement that he thought he had read in a newspaper

that the governor had pardoned a man with a life sentence, no specific instance being cited, and there seems to have been no further discussion thereof. We do not think it possible to deprive any juror of his common knowledge and the use thereof in his deliberations, and we see no injury to have been suffered by appellant. That this offense was of unparalleled ferocity none can deny; that it was an evidence of a heart regardless of social duty is apparent; that it was inexcusable is very plain; and, as the jurors seemed to think, this appellant should be taken out of society and suffer the penalty of death; and it is not our province to gainsay such opinion.

We think the original opinion properly disposes of this cause, and the motion for a rehearing is therefore overruled.