HORACE WILKERSON V. STATE

No. 32,661. February 1, 1961

MORRISON, Judge, dissented.

*Howard B. Law,* Dallas, for appellant.

*Henry Wade,* Criminal District Attorney, *William F. Alexander, Ben F. Ellis, Phil Burleson, Ed Miller,* Assistants District Attorney, Dallas, and *Leon Douglas,* State's Attorney, Austin, for the state.

WOODLEY, Presiding Judge

The offense is murder; the punishment, 99 years.

The indictment alleged that appellant did with malice aforethought kill Kathryn Fay Wilkerson by beating and striking her with a bottle.

The evidence shows that Kathryn Fay Wilkerson, the deceased, was the wife of appellant.

The nude body of deceased was found lying on a bed in the room she occupied with appellant. There were numerous lacerations and bruises about the body, including a bruise over the cheek bone and cuts in the scalp, the largest being on the left side going to the bone.

There was blood in the deceased's hair and a pool of blood on the floor at the head of the bed, and glass from a broken half gallon bottle on the floor.

Appellant told Officer Senkel that his wife had fallen off the bed and hit her head.

After his arrest appellant made a statement to City Detective Dhority which was introduced in evidence. Omitting the warning, which appears to conform to the requirements of Art. 727 C.C.P., the statement reads:

"This evening, August 21, 1959, about 5 o'clock I had a argument with my wife Kathryn and hit her on the left ear with the side of my right hand. I went outside and played dominoes for about 40 minutes then I went back into my apartment. My wife said she was going outside and get a drink, and I asked her not to do it and she said she was anyway. I picked up a half gallon wine bottle by the bed and hit her in the back of the head. She started bleeding and I took her to the bathroom and washed her head off and put some after shave lotion on it and it slacked off bleeding. I put her on the bed and took all her clothes off and went back outside and started playing dominoes. I heard my wife fall off the bed and I went back inside and put a icetray on her head and cranked up the phonograph and played 'Signed, Sealed and Delivered,' and went back outside and soon as the record was over I went back inside and turned the phonograph off and turned the radio on. My wife was still on the floor and I covered her up and went back outside and played dominoes for a while. I came back in and tried to hear if her heart was beating and when I couldn't hear it I called for someone to help me. Then I lifted her up on the bed."

Dr. Ashworth, who did the autopsy, testified that there were some two dozen bruises and lacerations on different parts of the body, several of which were in the scalp, the longest a deep cut over the left side of the head, compatible with a blow to the

head with a bottle. A deep laceration or tear over the interior surface of the liver, compatible with the type of injury from being kicked in the abdomen, and fractured ribs compatible with the type of injury which would result from being kicked in the ribs were found during the autopsy.

Dr. Ashworth testified that some of the bruises could be explained by the deceased having fallen on the floor, but others which produced serious internal injury would require a greater amount of force than would have been achieved by the body falling a relatively short distance, as from the height of a bed. He expressed the opinion that the cause of death was primarily a blow to the head, and the injury to the liver could have been had it occurred first.

Appellant testified as a witness in his own behalf at the trial. His version of the death of his wife was that she had been drinking wine; that he got her to go to bed about 11:30, at which time she was very drunk. He left and was gone about an hour. Later she "said she was going to get something to drink from somebody and I asked her not to. She said, 'Well, I will show you,' so I kept begging her, not to get drunk again, because I didn't want her to get drunk. I just came in and I had been gone ten days, and she said, 'I will get something from somebody,' that is when I lost my temper and hit her on the side of the head with the wine bottle. It broke and cut her head.

"Q. What was she trying to do when you lost your temper? A. She was trying to get by me, scuffling, trying to get by me to go get something to drink from some of the neighbors."

Appellant further testified that after striking her with the bottle he took his wife to the bathroom and washed her hair out, that she showed no anger about his hitting her with the bottle. "She realized that I was only trying to do what was right for her and keep her from getting drunk again. She knew she had done wrong by getting drunk that morning and starting again."

After washing the blood off he put her on the bed, took her clothes off, covered her with a blanket or quilt and "gave her a towel and asked her to lie there—so her head wouldn't start bleeding again." He left the room and resumed playing dominoes with a young boy on the porch. Later he heard a noise in the room and when he went in he found his wife on the floor. He told her to get back in bed but she said the floor was cool and she was sick at the stomach, but would be all right shortly and would get up.

He then said if she didn't mind he would go play some more dominoes and she agreed and he resumed playing.

He checked on her later and found her half way under the bed, "I said, 'Good God, get in bed and lie down,' and she said, 'No, I am still sick.' I said, 'All right, lie there if you want to lie in that dirt,' and I went to the bathroom. I came back through and asked her again to get up and she said, 'No, I am still sick.' I asked her if she wanted anything, and she said, 'No.' I went out there and it started getting dark and we couldn't see to play dominoes, so I come in the house and her feet was on the other side of the bed and she was about halfway under the bed and I pulled my shirt off and told her, I said, 'Well, I might as well go to bed, you are no company to me today,' I said, 'I might as well go to bed and forget about enjoying your company,' and she didn't say, she didn't answer me, so I reached down in the ice box, got me a glass of water and ate a bite of celery and some beans and stood there nibbling on some cheese and shut the box and turned around to her and said, 'Get up, now, let's get in bed,' and she didn't answer, * * * ."

The charge of the court submitted murder with and without malice and aggravated assault, and the defense of accident, and instructed the jury to acquit unless they found beyond a reasonable doubt that appellant voluntarily and intentionally killed the deceased and that her death was caused by beating and striking with a bottle, as alleged in the indictment.

We find the evidence sufficient to sustain the jury's verdict finding appellant guilty of murder with malice and assessing his punishment at 99 years in the penitentiary.

On cross-examination a photograph of the nude body of the deceased was exhibited to appellant and he was asked concerning various bruises shown by such photograph. He testified in part:

"Q. Is that how she appeared there that day? A. I don't recall just exactly how she looked, to be exact.

"Q. But you said you didn't see those bruises that are there in that picture? A. I saw the one on her shoulder and the one on her cheek.

"Q. You can't display that to the jury; how about the bruises in that picture, do you remember seeing those bruises like that when you put her on the bed or when the police came? A. She wasn't bruised like that.

"Q. You say she wasn't bruised like that? A. They didn't show any bruises like that at all only on her cheek."

In rebuttal the photograph and another similar one were identified by the officer who took them as a true representation of the scene; of the body lying on the bed and showing the bruises on the body as he viewed them through the naked eye.

The photographs were admitted over the objection "they don't add anything to the testimony which has already been testified to, they show the bruises and marks, they are inflammatory * * '. There is no dispute as to whether they were there or not, he just testified he didn't see them."

The rule relating to the introduction of photographs of the body of the deceased which may be inflammatory has been stated and applied in a number of rather recent decisions.

In Gibson v. State, 153 Tex. Cr. R. 582, 223 S.W. 2d 625, we said: "We think the condition evidenced by the photographs was useful to the jury in not only determining an intent to kill, but also the malice, if any was shown; and photographs have always been held admissable provided they serve to illustrate any necessary point in the cause."

In Ray v. State, 160 Tex. Cr. R. 12, 266 S.W. 2d 124, we said: "Regardless of the previous holding of this Court upon the question, it appears that the instant case is controlled by the case of Gibson v State, 153 Tex. Cr. R. 582, 223 S.W. 2d 625, wherein it was held that pictures of the deceased were admissible upon the issue of malice and intent to kill. Each of these matters was an issue in this case. We are unable to conclude that the pictures were not admissible as shedding light upon those issues."

In Cantrell v. State, 156 Tex. Cr. R. 329, 242 S.W. 2d 387, we quoted with approval from Gibson v. State, supra, and said: "If photographs serve to illustrate a disputed issue, it is immaterial that they are also inflammatory"

Appellant cites a number of cases where pictures were found to be inflammatory and not admissible under the facts. Among these cases are Wooley v. State, 162 Tex. Cr. R. 378, 285 S.W. 2d 218; Shaver v. State, 162 Tex. Cr. R. 15, 280 S.W. 2d 740; Borroum v. State, 168 Tex. Cr. R. 552, 331 S.W. 2d 314.

Wooley v. State is not regarded as authority in this case, for

the reason that it was reversed on other grounds. Shaver v. State is also not regarded as authority in this case, for the reason that it too was reversed on other grounds. At best, these two cases seem to be dicta rather than authority.

Judge Davidson wrote the opinion of the court reversing the Borroum case, actually upon the failure of the trial court to grant a special requested charge, and while Judge Morrison concurred in the reversal of that conviction, he did so because of the introduction into the evidence of State's Exhibit No. 4, which was a photograph of the deceased taken at the scene of the homicide. The Borroum case was not reversed solely upon the grounds of the introduction of the photograph, and is not here controlling. If anything said in the Borroum case, supra, may be construed as contrary to the rule stated in Gibson v. State, and Ray v. State, supra, such hoding is specifically overruled.

We find no error in the admission of the photographs and we find no error in the record which calls for reversal.

The judgment is affirmed.

MORRISON, Judge, (dissenting.)

I remain convinced of the soundness of the very recent holding in Borroum v. State, supra, and respectfully dissent to the affirmance of this conviction because of the admission into evidence of photographs of the nude and bloody body of the deceased taken at the scene which shed no light upon any issue in the case.