GENE CARROLL BROWN v. STATE.

No. 34,167.  February 14, 1962
Motion for Rehearing Overruled April 18, 1962

230

*Allan J. Showers,* Houston, for appellant.

*Frank Briscoe,* District Attorney, *Carl E. F. Dally, Lee P. Ward, Jr.,* Assistants District Attorney, Houston, and *Leon Douglas,* State's Attorney, Austin, for the state.

McDONALD, Judge.

The offense is murder; the punishment, life.

The testimony reflects that the deceased, John Farris, and his companion, R. D. Andrus, after spending several hours at the Electronic Lounge, were leaving at the time the lounge closed after midnight. As they were leaving they helped push and start a car driven by Mrs. Ruth Jackson, who had been working at the Electronic Lounge that evening. Mrs. Jackson was accompanied by Doris Green.

The appellant had also been a patron at the same lounge that evening, but it seems that he and the deceased, and the deceased's companion had had no conversation or any difficulties that evening. Prior to closing time, the appellant had been accompanied by Doris Green while he took his nephew home. This apparently took only a short period of time, and Doris Green went back into the lounge just before it closed.

Farris and Andrus, after helping Mrs. Jackson start her car, followed in their car down the road to a drive-in where both cars stopped. Almost immediately a brown pickup driven by the appellant drove up beside Mrs. Jackson's car. The vehicles were stopped for only four or five minutes. While stopped, Farris conversed with Mrs. Jackson and Doris got out of Mrs. Jackson's car and talked to the appellant. It appears that Mrs. Jackson also talked to the appellant, and he told her that he wanted to take Doris Green home. Mrs. Jackson informed the appellant that Doris was going home with her. The appellant then told her he wanted to talk to Farris and Andrus, that he "had something that would make them walk his way". The parties then drove on a short distance, and the deceased stopped his car and Mrs. Jackson drove up behind him and stopped. While standing close to the back of her car with John Farris, the deceased, Mrs. Jackson "heard something go like a firecracker" and saw the deceased

"catch his shoulder". She saw the appellant standing by his pickup and "he had something in his hand with fire coming out of it". She heard five or six other shots fired in rapid succession and then heard a clicking sound.

Andrus got out of the deceased's car when he heard the first shot and ran to the deceased who told Andrus that he had been shot and asked Andrus to get him to a doctor. Andrus described the shooting in substantially the same manner as Mrs. Jackson. They said the appellant then got in his pickup and left at a rapid rate of speed, spinning his wheels as he left and almost struck Mrs. Jackson with his pickup.

Highway Patrolman Ben L. Bean testified that he arrested the appellant while he was driving a Falcon pickup truck in the vicinity of Dayton in Liberty County. When he was arrested the appellant had eleven live rounds of .22 caliber ammunition in his pocket. The appellant was then taken to the Liberty County Courthouse where he was picked up by officers of the Harris County Sheriff's Office. The appellant was removed to the Harris County Jail, and his pickup truck was driven to the Harris County Courthouse. A search of the pickup revealed a .22 caliber revolver hidden in the compartment under the dash board. Ballistics tests made showed that slugs taken from the body of the deceased had been fired by the pistol recovered from the appellant's pickup. A paraffin test, which was made on the appellant's hand, revealed a heavy concentration of nitrate particles on his right hand indicating that he had recently fired a gun.

Dr. W. W. Coulter, a pathologist in the Medical Examiner's Office, testified that the cause of death of John Farris was a gunshot wound in the left chest. He further testified that he had examined the body and had found three gunshot wounds.

The appellant took the stand and testified in his own behalf. He testified that he had been convicted of robbery and had served his time in the penitentiary, and that he had come to Houston, Texas, from Kentucky to visit some of his relatives. That he had carried the pistol with him on his trip from Kentucky for his protection. On the night in question the appellant testified that he and a fifteen-year-old cousin were at the Electronic Lounge, and just prior to closing time he was going to take the boy home and "run by" and see his grandfather and take his grandfather a "few beers". He said that as he was leaving the Electronic Lounge Doris Green, who had been sitting at his table, complained of being sick at the stomach and he asked her if she would like to

go for a ride and get a little fresh air, and perhaps it would make her feel better. He testified that she rode with him to his grandfather's place which was about two miles from the Electronic Lounge. As they returned to the lounge, he said that he dropped a cigarette in the seat and after he stopped he was trying to find the cigarette so it would not cause a fire. Doris Green went back into the Electronic Lounge. At this time, he noticed that one of the billfolds which he was carrying and which contained approximately $87.00 was missing. By this time he saw Doris Green and Mrs. Jackson in Mrs. Jackson's car, and the deceased and Andrus in the deceased's car pushing the Jackson car to get it started. He said that he followed their cars in order to ask Doris Green about his money. The appellant said as he pulled up behind Mrs. Jackson's car on the road, he thought he heard the deceased say as he got out of his car, " 'I will get this punk off our trail,' and he didn't exactly stop, he just momentarily slowed down and said, 'I will get this punk off our trail,' that is what it sounded like to me, and proceeded on toward me." He said that the deceased was a "pretty good-sized boy around 200—pretty good size"; that he did not want to have a fist fight with him so he stepped outside his car and fired three times at the feet of the deceased. The deceased did not stop but kept coming, then "he momentarily stopped and I told him that if he'd come and give my money back, just throw it down in front of the lights and I'd get it and he could go on about his business, that I didn't want to hurt no one." He further testified that the deceased kept coming toward him and the appellant "put three more at his feet"; and he said to the deceased that he did "not want to have any trouble with him and if he would just bring his money, just drop it right there". The deceased then said to him, "I ain't got your money" and lunged at the appellant. The appellant then shot at Farris three times. He further testified that through fright he left the scene and started to return to Kentucky.

The jury accepted the State's theory of the case and rejected that of appellant and we find the evidence sufficient to sustain their verdict.

The court's charge was full and complete and included an instruction on murder without malice, the right of self-defense, and adequately protected all of the rights of the appellant. There were no formal bills of exception filed, but several informal bills of exception were reserved in the statement of facts filed herein.

It is the contention of the appellant that the trial court erred in admitting certain testimony which, under the State's theory of

the case, showed a motive for the killing of John Farris by the appellant.

Mr. T. J. Griffin, proprietor of the Riverside Inn, testified that on the evening of December 1st, 1960, he was introduced at his place of business to the appellant by Dude Landrum. At the time of the introduction while the appellant was still standing within three or four feet and in a position where he could hear, John Farris, the deceased, spoke up and said to Griffin, "Tommy, watch that fellow over there (referring to the appellant). He's an ex-convict and he is just out of Alcatraz for bank robbery, and I know something that will send him back and he knows that I know it." Immediately after this was said by Farris, Landrum and the appellant paid a deposit on the bottles containing the beer which they were drinking and left Griffin's establishment.

We hold this evidence was admissible to show that the appellant had a motive for killing Farris. If the appellant heard deceased's statement and it was known or thought to be true by the appellant, it would furnish a motive for silencing Farris by killing him.

The question of whether or not Farris' statement to Griffin was heard by the appellant would be a question of fact to be decided by the jury. No request was made by appellant for a special charge instructing the jury not to consider such evidence if they believed it had not been heard by the appellant. All of the evidence shows he was in a position to have heard the statement, and his actions showed that he did. 24 Texas Jur. 2d Sec. 565, p. 78-80; LaGrone vs. State, 135 S.W. 121 and Powell vs. State, 269 S.W. 443. The evidence of the prior conviction was already in evidence as the appellant, himself, had so testified. The trial court did not err in admitting this evidence.

Appellant also contends that the trial court erred in permitting the State to introduce photographs showing where Farris fell after being shot. State's Exhibit No. 2 was the body of Farris fully covered by a sheet, and State's Exhibit No. 8 shows the deceased fully clothed and was taken at such an angle that only the lower extremities of his body are shown. In neither picture is there visible any blood or anything of an inflammatory nature. There was a conflict of testimony beteween that of the appellant and other witnesses as to where the deceased was standing when he was shot and where he fell. These photographs were admissible to illustrate a disputed issue. Gibson vs. State, 153 Texas Cr. Rep. 582, 223 S.W. 2d 625; Cantrell vs. State, 146 Texas Cr.

Rep. 329, 242 S.W. 2d 387; Bell vs. State, 340 S.W. 2d 294; Wilkerson vs. State, 342 S.W. 2d 431; and Craig vs. State, 347 S.W. 2d 255.

Finding no reversible error, the judgment is affirmed.