## RUBYE RAY V. STATE.

No. 26,682. February 24, 1954.
Appellant's Motion for Rehearing Denied (Without
Written Opinion) April 14, 1954.

*Jerome H. Parker, Jr., Al Clyde,* Ft. Worth, and *C. S. Farmer,* Waco, for appellant.

*Wesley Dice,* State's Attorney, Austin, for the state.

DAVIDSON, Judge.

Murder is the offense; the punishment, twenty-five years in the penitentiary.

Childless and despairing of hope that they would ever have children of their own, appellant and her husband decided to adopt a child into their home. With that in view, an application was made to a children's home, as a result of which they obtained, at the end of October, 1951, a five-year-old boy, John Thomas Owens, the deceased. There is no evidence that the child was ever legally adopted by them.

The testimony shows that the boy was retarded both mentally and physically; that he did not have the intelligence of an average two-year-old child; that, to an unnatural degree, he was insensible to pain and would not cry out or scream when hurt; that he was unable to keep a normal balance when walking; and that he was unable to talk coherently.

The child lived with appellant and her husband for some five months before his death on March 14, 1952.

In the early evening of the aforesaid date, a physician, Dr. Fredeking, was summoned to the appellant's residence on Moore Street in the city of Fort Worth. When he arrived, appellant was hysterical but in the general confusion it was indicated that he should see the child. In the bedroom, the boy lay dead.

An examination, after the arrival of detectives, revealed small hunks of flesh torn from the deceased's body, deep, penetrating cuts through the lower lip, a torn and flattened nose, front teeth missing, and an arm broken. However, according to a detective participating in the examination, there was no blood on the body, which at that time was clothed.

The deceased was then taken to the Lucas Funeral Home, where pictures of the body in the nude were taken. A justice of

14

the peace, on being contacted by the police and coming to the funeral home, ordered an autopsy.

Dr. Andujar, a pathologist, was called to perform and explain in the presence of witnesses the results of such autopsy. His findings included: "multiple cerebral and cerebellar Hemorrhages with two skull fractures and 14 contributing causes . . . 258 recent cuts and abrasions, 44 old scars . . . a fracture of the . . . arm bone . . . a piece of lower lip missing . . . an old third degree burn right down to the bone at the base of the spine . . . a recent second-degree burn on the . . . thigh . . . a dislocated left index finger . . . a missing fingernail . . . blood in the chest . . . a big hemorrhage . . . within the belly cavity." The witness further testified that the spleen was broken; that the body was undernourished; that the "nose was broken, smashed and pushed in so that the medium plate of the nose, the septum, was protruded backward up into the sinuses at the base of the bridge of the nose"; that there were numerous fresh burns present, and also sharp cuts and puncture marks, both old and recent, on the male organ. An internal surgical examination was also made—of the skull, chest and abdominal cavity. The organ controlling bodily coordination, the cerebellum, was severely injured. It was the witness's opinion that the 258 cuts and abrasions were made within a few hours of death; that, with the other injuries, the untreated laceration and internal bleeding in the spleen, the accumulation of blood in the chest, the hemorrhaging in the stomach, the multiple cerebral hemorrhages and the skull fractures would cause death. It was his opinion, also, that "the cause of the ruptured spleen was the application of external force," and that any of the aforesaid factors, independent of each other, could have caused death.

Following the autopsy, officers carried appellant home from the hospital to which she had been taken due to her hysterical condition. From there, they took her to the police station for questioning. After statutory warning, appellant there made a statement to the then district attorney, in which she recounted whipping the boy numerous times with the small leather belt which was admitted in evidence at the trial. She also recounted that on the day of the tragedy she became annoyed with the child and "knocked him off the chair" in which he had been standing; that after picking him up and kissing him, he went outside but returned shortly and crumpled over in convulsions; that when he stopped breathing she left the house to call her husband; and that on her return she thought she "fainted."

After the making of the statement, the officers took appellant home. There, she handed them the belt referred to (which is 3/4 inch wide, 18½ inches long, and weighs under two ounces). Noticing her high-heeled boots in the living room, the officers examined them "for anything that might lead to her having injured the child in any way with them by kicking or stamping him." They found "some fragments (of hair) imbedded in the leathers of the heel . . . three strands." It was the expressed opinion of one of the officers that the hairs were of the same color as the child's. The witness testified that "after examining them" (the hairs), he did not recall "what happened to them." The hairs were never identified as being those of the deceased, the witness testifying that he did not know "that hair can be definitely identified as to type and from whom it came . . ."

Appellant refuted a portion of the statement which was admitted in evidence. She testified that she made two statements; that she signed the second one but that "they changed words . . .to make it sound different"; that she "was forced to sign it"; and that "they would not let" her "call a lawyer."

On the trial, appellant, corroborated by a number of witnesses, sought to explain the deceased's injuries as follows: that he injured himself by falling in the rocky yard, down the unrepaired steps, on a neighbor's concrete porch—constantly bruising and hurting himself and not allowing the wounds to heal; that by digging into the sores, scabs could not form and the sores always stayed "open and fresh" and that the child felt no pain when so gouging into them. She stated that their dog often scratched him; that the burn at the base of his spine was caused by his backing too close to a stove; and that through all the multiple injuries that would cause a normal child to scream with pain he never cried. She further testified that he "moved about like a monkey," did not see well, had no ability to communicate his need for or to control body eliminations, and could speak only a few words at a time.

A former neighbor testified that appellant told her that she and her husband loved the boy and intended to adopt him, also that they had insurance on his life and a burial policy. There was no proof of the issuance of such insurance.

There was testimony that when the Rays moved from the neighborhood about six or seven weeks before the alleged murder, the boy was "beat up something pitiful." On questioning, one witness testified, "As to why I volunteered the information,

because he looked like it. If you had had on your head what he did, you would have been beat up, you could not have fallen and done it . . ." Witnesses told of hearing—but not seeing—numerous and prolonged beatings by the appellant, whose voice would be raised in anger. During such torture, the child seemed incapable of making outcry other than uttering short words, such as "I," "no," and "yes."

A defense witness, Dr. Little, testified that, in his opinion, a "green stick fracture" of the skull could be occasioned by a fall on the head. He stated that such type fracture "gets its name from the fact that the break works like it does, a stick that . . . still has sap in it, off a tree . . . . It is a type of fracture that is found in people with soft springy bones," such as in children; that "such an application of force . . . could . . . have ruptured the spleen," that organ being "very tender and very easily ruptured, full of blood." While the state's testimony shows that a "tremendous stellate (star-shaped) fracture with pieces of the bone driven into the brain" would cause the body to go into such a state of shock that there could be very little coordination of movement, this witness testified that "some congenital defect of the central nervous system" would cause defective vision and sense of balance, incoherence of speech, lack of pain, and muscular incordination; that convulsions and death could be caused from a skull hemorrhage resulting from a fall on the head. On cross-examination, however, Dr. Little stated that he "had never seen a green stick fracture of the skull" and that "they are very rare."

This extended statement of the facts, including the showing of the injuries of the deceased, is deemed necessary for a proper evaluation of the questions presented for review.

Upon presentation of its case in chief and before the introduction of any evidence by the appellant, the state introduced in evidence three pictures of the deceased. Two of these are close-up views of the head, neck, and shoulders; the other is a full length view of the nude body. These pictures show plainly the bruised and torn condition of the head and body of the child, and are so horrible and revolting as to be readily calculated to arouse resentment against the person guilty of inflicting the injuries.

Appellant objected to the introduction of the pictures as being prejudicial, highly inflammatory, and not tending to solve any disputed issue in the case and, therefore, immaterial.

The correctness of appellant's contention that pictures of the body of a deceased are ordinarily not admissible but become so only when they tend to solve some disputed issue in the case is not challenged.

So then, the question thus presented is whether the pictures served to solve some disputed issues in the case.

Arising under the facts of this case were the issues of murder with and without malice, aggravated assault, the means used, and the intent to kill, all of which were pertinently submitted to the jury by the trial court in his charge. In addition thereto, the trial court recognized that the case was one of circumstantial evidence. The defense of lack of intent to kill, and that of accidental death arose also.

Regardless of the previous holding of this court upon the question, it appears that the instant case is controlled by the case of Gibson v. State, 153 Tex. Cr. R. 582, 223 S. W. 2d 625, wherein it was held that pictures of the deceased were admissible upon the issue of malice and intent to kill. Each of these matters was an issue in this case. We are unable to conclude that the pictures were not admissible as shedding light upon those issues.

Appellant challenges the sufficiency of the evidence to support the conviction, in the following particulars: (a) the absence of any proof showing malice, (b) the absence of any evidence showing an intent to kill, and (c) the absence of any proof showing that appellant inflicted the wounds that caused the death of the deceased, and (d) the absence of any proof that death was caused by the means alleged in the indictment.

In order to properly appraise these contentions, it becomes material that we note the accusations as set forth in the indictment.

The indictment contains four counts, each charging the murder with malice of John Thomas Owens, as follows: The first count charges that the offense was committed "by striking and hitting him with an instrument or instruments the exact nature of which is to the Grand Jurors unknown." The second count charges that the offense was committed "by striking, hitting and beating him with her hands." The third count charges that the offense was committed "by kicking and stomp-

ing him with her feet with shoes on." The fourth count charges that the offense was committed by the combined means alleged in the second and third counts—that is, "by striking, hitting and beating him with her hands," and "by kicking and stomping him with her feet with shoes on."

No election as between counts or the transactions alleged therein was made, nor was the trial court requested to do so. All the counts were submitted to the jury and the jury instructed to convict upon a finding of guilt under the allegations of any one of the counts.

The jury in their verdict made no finding as upon which count or transaction they predicated guilt, but returned a general verdict finding appellant "guilty of murder with malice."

The burden is upon the state to prove that the deceased was killed by the means and in the manner alleged in the indictment. Branch's P. C., Sec. 1858; 22 Tex. Jur. 623.

The issue for our determination is whether the facts authorized the jury to conclude that appellant, with malice, killed the deceased by any one or more of the specific means alleged in the indictment.

The instruments with which the killing is alleged to have been committed are not deadly weapons, per se. They could become such only in the manner used.

Intent on the part of the appellant to kill was an essential element to be established in order to convict. Baylor v. State, 151 Tex. Cr. R. 365, 208 S. W. 2d 558. The trial court so recognized the rule, and instructed the jury to return a verdict of not guilty in the event they had a reasonable doubt that appellant did not intend to kill the deceased. Also, the jury were instructed to acquit if they entertained a reasonable doubt if the death of the deceased was accidental or was brought about by reason of deceased's accidentally falling.

The jury, by their verdict, rejected all these defensive theories.

The wounds and injuries inflicted upon the deceased evidence the brutality and ferociousness of the attacks. It would be a strange doctrine, indeed, to hold that the jury were not author-

ized to find that the deceased did not come to his death as the result of the criminal act or agency of another, or that the attacker did not have the intent to kill, or that the killing was not actuated by malice.

We would not be warranted, therefore, in overturning the verdict of the jury because of the failure of the facts to show the corpus delicti, and intent to kill, and malice.

The remaining fact, then, to be determined is the identity of the appellant as the person who inflicted the injuries to and thereby caused the death of the deceased by one or more of the specific means alleged in the indictment.

That appellant was in position and had the opportunity to inflict the injuries appears not to be disputed. But opportunity to have done so does not necessarily show that she did do so. Such fact, however, may constitute a circumstance which may have been considered by the jury.

There is no fixed rule for determining the sufficiency of the evidence to sustain a conviction in all situations. Of necessity, each case must be tested by the particular facts and circumstances there presented. Adjudicated cases constitute a precedent only for the particular facts there present. It is the province of the jury to determine fact situations. The preservation of our jury system demands that the jury shall always remain the arbiter of disputed fact issues.

Whether an appellate court does or does not agree with the conclusion of the jury is of no importance. It is the province and duty of this court to determine if there be evidence which, if believed, would warrant the jury's verdict. If there is such evidence, then we have no authority to set aside the verdict.

Under the facts and circumstances here presented, we cannot say that the jury was not warranted in reaching the conclusion that appellant, with malice, voluntarily killed the child by one or more of the means charged in the indictment.

To protect herself against any injury by reason of the alleged delay or mishandling of the interrogatories and the disposition of her out-of-state witness, appellant should have requested a delay or postponement of the trial. Not having done so, the question is not preserved.

No reversible error appearing, the judgment is affirmed.

Opinion approved by the court.