Samantha Jane DAVIDSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 07–86–0119–CR.

Court of Appeals of Texas,
Amarillo.

Sept. 29, 1987.

William A. Bratton, III, Frank S. Wright, Dallas, for appellant.

Travis Ware, Crim. Dist. Atty., R. Deniece Jones, Asst. Crim. Dist. Atty., Lubbock, for appellee.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

REYNOLDS, Chief Justice.

Appellant Samantha Davidson brings this appeal from a judgment decreeing that she is guilty of committing the offense of murder, a first degree felony, by knowingly and intentionally causing the death of Richard Grier Luster. After a jury finding of guilt, the trial court assessed punishment of fifteen years confinement in the Texas Department of Corrections. Based on the following rationale, we affirm the judgment.

The body of Richard Grier Luster was discovered in a caliche pit six miles east of Lubbock during the early morning hours of 8 November 1980. Luster's death apparently resulted from wounds caused by two gunshots from a .38 or a .357 caliber Colt revolver.[1] Subsequent investigation resulted in development of a complex set of relevant facts which eventually led to the separate indictments of both appellant and Vernon Ray Gilmore.[2]

By her first point of error, appellant contends that the evidence is insufficient to support a finding of guilt by the jury. Therefore, it is necessary for this Court to marshal all relevant evidence in a light most favorable to the prosecution, and determine whether any rational trier of fact could have found all the essential elements of murder beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Wilson v. State,* 654 S.W.2d 465, 471 (Tex.Cr.App. 1983).

At the outset, we recognize that appellant's conviction is based entirely on circumstantial evidence and that the correct standard for review of evidence in all cases, both direct and circumstantial, is the test announced in *Wilson v. State,* 654 S.W.2d *supra,* at 471. We also recognize that if the circumstantial evidence supports a reasonable hypothesis other than the guilt of the accused, a finding of guilt is not a rational finding. Id. at 472.

Therefore, viewed in a light most favorable to the prosecution, the record shows that on 3 November 1980, appellant accompanied Richard Luster and Tom Joyce to pick up Vernon Ray Gilmore at the Lubbock International Airport. While at the airport, Joyce heard appellant tell Luster, "If you start any shit in here, you are on your own." Afterwards, while sitting in the airport bar, Luster appeared nonconversational, mostly allowing the other three members of the group to talk.

1. One shot entered the chest on the left side, passed through the chest cavity, and lodged in the right shoulder. The other shot entered the left side of the head just below the temple and exited on the right side, creating a third wound.

2. Gilmore was tried separately in Lubbock County and, after being found guilty, sentenced to ninety-nine years in the Texas Department of Corrections. On appeal, this Court, although concluding the evidence was sufficient to support Gilmore's conviction, reversed the judgment because of the erroneous admission of newspaper articles into evidence, and remanded the case for retrial. *Gilmore v. State,* 666 S.W.2d 136 (Tex.App.—Amarillo 1983, pet'n ref'd).

Sometime thereafter, appellant, Luster, and Gilmore checked into the Hilton Inn of Lubbock. Luster and appellant occupied one room, while Gilmore occupied the room next door.[3] Joyce visited with Gilmore at the Hilton on the following day. While there he noticed that Gilmore was in possession of a loaded, high caliber revolver. Joyce also observed appellant enter Gilmore's room for a few minutes and then exit.

On the following day, 5 November 1980, Diana Cavazos, a maid at the Hilton Inn, noticed that there was a bank bag in Gilmore's room. According to Cavazos, the bag was lying open and contained money and a pistol. While she was cleaning, a caucasian man matching Gilmore's description entered the room, picked up the bag, and left. Cavazos also testified that prior to cleaning Gilmore's room, a woman matching appellant's description told her that no maid service would be needed in the room next door, apparently indicating that appellant and Luster were still checked in at this time.

At about 2:30 that same afternoon Sue Bryan Richards observed appellant and Gilmore[4] in a flower shop, the Texas Floral Company, where Richards was employed. Richards testified that she remembered the couple because they smelled of alcohol and they were "petting and holding hands, kissing and loving" with each other. Richards also stated that she observed the couple leave in a white Plymouth Volare.

Oma Lea Gilmore, Vernon Gilmore's mother, testified that Vernon borrowed her white Plymouth Volare repeatedly from the time he arrived in Lubbock on the morning of November 3, until 9:30 or 10:00 on the evening of his departure, November 5. Most importantly, Mrs. Gilmore specifically testified that her son was in possession of the Volare all day, until late evening, on the fifth, the day after which Luster was never again seen.

Gilmore last borrowed the car on the morning of 5 November 1980. He told his mother that he needed it so he could take appellant to the airport late that afternoon. However, appellant did not leave town; she was seen at approximately 10:30 p.m. checking a Mr. R. Grier into room number 110 at the Carriage House Motel in Lubbock.

The key to room 110 eventually turned up in the front pants pocket on Richard Luster's dead body. Subsequent investigation led sheriff's deputies to the Carriage House Motel. Upon entering, authorities found all of Luster's luggage, still packed and apparently undisturbed by whoever occupied, or did not occupy, the room.

Mrs. Gilmore also testified that in late October of 1980 Vernon was unloading a pistol in one of the rooms of her apartment when the gun accidentally discharged, leaving a bullet lodged in the wall. After hearing about the incident investigators went to the apartment, recovered that round, and compared it to the bullet taken from Richard Luster's right shoulder. The comparison produced a match.

Deputy Sheriff Don Gass testified that after appellant and Gilmore were apprehended, he had occasion to interview appellant. After being duly warned she waived her rights and discussed her version of what had transpired.

According to appellant, she last saw Luster on 5 November 1980 at the Lubbock Hilton when he requested that she take his luggage to the Carriage House Motel and register him under the name of "R. Grier." Pursuant to his instructions she did so, after which she went to a friend's house. On return to the Carriage House Motel, appellant noticed Gilmore's mother's Plymouth Volare in the parking lot. She left a note on it for Luster, and proceeded to pick up Gilmore at his mother's house.

---

3. None of the witnesses were clear on the question of who occupied which room or what events took place in which room. However, it is clear that Luster and appellant shared a room and that the rooms in question were 413 and 414 at the Hilton Inn.

4. Not appellant and Luster, with whom she was supposedly having a love affair.

Appellant stated that she first saw blood on the right side of the passenger door of Gilmore's mother's Volare when she and Gilmore returned to the Carriage House Motel. On making this observation, Gilmore went to look inside the car at which time he saw a large amount of blood on the seat and became very excited. At this time, appellant was driving Luster's green Buick Riviera. She took that car and left. Gilmore took his mother's car to the car wash, sprayed the blood from inside, and met appellant at Gilmore's mother's house. From there the two immediately left for Austin, Texas in Luster's Riviera. They stayed in Austin for a day or two after which they flew to San Francisco and met up with one Amanda Witt. From there all three drove to Washington, and eventually crossed the border into Canada.

On their return, customs officials at Blaine, Washington requested identification from appellant and Gilmore. Gilmore produced a birth certificate bearing the name of his brother, Timothy Gilmore. Appellant produced no proof of identification and claimed that she was Reba Witt, Amanda's sister. Shortly thereafter, customs agents determined both appellant's and Gilmore's true identity and discovered warrants for each of their arrest. Both were then arrested, each waived extradition, and both arrived back in Texas on 1 January 1981.

As of that time Lubbock officials were unaware that the Plymouth Volare might be involved with Luster's murder. Following the interview with appellant, a warrant was obtained on 5 January 1981 and the car was searched. When officers removed the interior panel from the passenger side door, they discovered a large amount of dried blood. Typing revealed that blood found in the door and blood taken from Luster's body were both O-positive.

Tim Gilmore, Vernon's brother, testified that in late October 1980, Richard Luster phoned Vernon's mother's house, where Tim also resides, looking for Vernon. When Tim told Luster that Vernon was not there Luster told Tim, "If you value your brother's life you will tell him to report to me daily, and if you value your own life, then you will give him the message." He also testified that he had observed his brother in possession of a black snub-nosed .38 caliber pistol with a wooden handle.

Admitted into evidence was the testimony and oral deposition of Vernon Ray Gilmore. According to Gilmore, shortly after he had been found guilty of murder and sentenced in Lubbock County, appellant visited him in the county jail. While there, shortly before leaving, appellant said to Gilmore, "I did it. I am sorry."

In considering whether the evidence is sufficient to support appellant's conviction, it is noted that the evidence presented at trial creates a strong impression that Vernon Gilmore committed the offense in question, albeit he denied he did so. However, an accused may be found guilty as a party to an offense committed by another if the accused acted with intent to promote or assist the commission of the offense by soliciting, encouraging, directing, aiding, or attempting to aid the other person in committing the offense. Tex.Penal Code Ann. § 7.02(a)(2) (Vernon 1974); *Romo v. State*, 568 S.W.2d 298, 303 (Tex.Cr.App.1978).

In order to determine whether the accused is a party to the offense and bears criminal responsibility therefor, the court may admit evidence regarding events before, during, and after the commission of the offense. *Wygal v. State*, 555 S.W.2d 465, 468–69 (Tex.Cr.App.1977). Further, circumstantial evidence is sufficient to show that the accused was a party. *Morrison v. State*, 608 S.W.2d 233, 234 (Tex.Cr.App.1980).

Appellant was continuously in the company of Gilmore and Luster for several days immediately prior to, and up to the time of, Luster's death. Appellant and Luster met Gilmore at the airport on the third, and all three checked into the Lubbock Hilton. Gilmore and appellant were seen together repeatedly on the fourth and

fifth, and several times thereafter. Further, while together, all three appeared to be sharing and driving each others' automobiles, that is, Luster's Buick Riviera and Gilmore's mother's Plymouth Volare.

Where the accused is convicted as a party it is well settled that mere presence alone does not form a sufficient basis to support the conviction, however, when combined with additional facts the jury may infer that the accused was a participant. *Ortiz v. State,* 577 S.W.2d 246, 248 (Tex.Cr. App.1979). Other probative evidence includes testimony that appellant was obviously "involved with" Richard Luster. The two shared a room together at the Hilton, and the State introduced two photographs of Luster holding a sign that read "I LOVE SAM." Yet, on November fifth, the probable day of Luster's death, appellant and Vernon Gilmore were seen "kissing" and "petting" at the Texas Flower Company.

Further, testimony regarding appellant's comment at the airport, "If you start any shit here, you are on your own", and Luster's demeanor while in the airport bar reasonably could indicate to the jury a probability that some degree of animosity existed between Luster and appellant, or Luster and Gilmore. Luster's phone call to Tim Gilmore reinforces this hypothesis. Moreover, the jury was entitled to infer appellant's involvement by the evidence that she was in possession of the deceased's automobile, and the Carriage House motel key, which appellant testified was not yet in her possession when she last saw the deceased, was found in his front pants pocket.

Finally, after appellant and Gilmore became aware of evidence that some wrongdoing had occurred, rather than contact the police, the couple took Luster's car, fled to Austin, then to San Francisco, and then into Canada. Although flight itself does not give rise to a presumption of guilt, it is an additional circumstance from which

guilt can be inferred. *Arivette v. State,* 513 S.W.2d 857, 862 (Tex.Cr.App.1974).

Moreover, when appellant, Gilmore, and Witt were stopped by customs officers at the Canadian border Gilmore produced his brother's birth certificate. When asked for further identification he stated that he had none. The officer asked to see his wallet and immediately discovered Gilmore's Texas drivers license. When asked why the name differed from that on the birth certificate Gilmore told the officer that he carries his brother's certificate because his brother "loses things." In proving flight, it is also relevant to show the circumstances surrounding capture of the accused. *Id.* at 863.

When asked for proof of identity appellant simply claimed that her name was Reba Witt and that she had no identification. Officers later discovered something with the name "Samantha Davidson" in the car, and eventually appellant confessed her true name because she did not want her friend Amanda to get into trouble for any violation of federal law.

All facts considered, we hold that after viewing the evidence discussed in a light most favorable to the prosecution, a rational trier of fact could find all the essential elements of murder beyond a reasonable doubt. *Wilson v. State,* 654 S.W.2d *supra,* at 471. We also hold that the facts and circumstances support no reasonable inference other than the appellant's guilt. *Porter v. State,* 634 S.W.2d 846, 849 (Tex.Cr. App.1982). For these reasons appellant's first point is overruled.

■ In her second and fourth points of error appellant contends that the trial court erred in not instructing the jury on the law of reasonable doubt and the law of circumstantial evidence. For purposes of simplicity and clarity these points are considered together.[5]

With regard to the contention that the trial court should have instructed the jury

---

**5.** The consideration, of course, is based on our understanding of arguments appellant makes

under the points.

on the law of reasonable doubt, appellant directs the Court's attention to the dissenting opinion in *Hankins v. State*, 646 S.W.2d 191, 203 (Tex.Cr.App.1983), where Presiding Judge Onion discusses the holding of the United States Supreme Court in *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954). In *Holland*, the Supreme Court held that no instruction on the law of circumstantial evidence is necessary where the jury is instructed on the law of reasonable doubt. *Id.* at 139–40, 75 S.Ct. at 137. From this appellant would have this Court hold that because there was no instruction on circumstantial evidence, it was error not to include a charge on reasonable doubt.

Appellant's argument is not logically compelling. Nowhere in *Holland* does the Supreme Court say that the jury must be given one instruction or the other. Judge Onion also does not contend that the jury must be charged on either circumstantial evidence or reasonable doubt. In his dissent, he argues for the proposition that following a charge on reasonable doubt an additional charge on circumstantial evidence does not confuse the jury as to the standards applied to direct and circumstantial evidence cases. Further, Judge Onion specifically states that "the term 'reasonable doubt' is not normally defined in a Texas criminal case. A host of cases hold that it should not be defined." *Hankins v. State*, 646 S.W.2d *supra*, at 208. Further, even if the dissent did support appellant's position, it is a fundamental principle of Texas jurisprudence that dissenting opinions do not constitute controlling authority. This Court is unaware of any jurisdiction where the rule is otherwise.

Finally, in footnote one in the majority opinion in *Hankins, id.* at 199, the Court of Criminal Appeals specifically states that the "minor difference between *Holland* and the practice in this jurisdiction of not defining reasonable doubt is insignificant" and "extraneous to our determination that a circumstantial evidence charge is improper." Clearly, the trial court's instruction on circumstantial evidence, whether included or omitted, has no bearing on the necessity for charging the jury on the law of reasonable doubt. Appellant does not refer this Court to any authority to the contrary.

■ In response to the contention that the jury should have been instructed on the law of circumstantial evidence, the Court of Criminal Appeals has held that "the arguments in favor of abolishing the requirement of a circumstantial evidence charge are meritorious and we now hold that the charge is improper." *Hankins v. State, id.* at 197. Appellant recognizes this rule in her brief, but she contends that the *Hankins* court changed the rule in 1985, and therefore, due to ex post facto considerations, she is entitled to an instruction under the rule as it was in 1980 when the offense occurred.

It is well settled that "ex post facto considerations affect only substantive, not procedural matters." *Patton v. State*, 696 S.W.2d 249, 251 (Tex.App.—San Antonio 1985, no pet'n). Nevertheless, appellant maintains that because the judicial change detrimentally affected her substantive rights, the pre-*Hankins* rule should apply. In support of this position, she cites *Chalin v. State*, 645 S.W.2d 265 (Tex.Cr.App.1983), under which "legislation and judicial action may not retroactively subject a person's actions to criminal prosecution, ... and may not retroactively subject criminal actions to a potentially more onerous punishment, ... but may change the procedures whereby it is determined whether a person has committed a criminal act, or what punishment is appropriate." *Id.* at 271.

The *Hankins* charge did not subject appellant to retroactive criminal prosecution and it did not create a potentially more onerous punishment. Appellant was equally subject to prosecution and punishment for her actions before and after the *Hankins* decision. Points two and four are overruled.

Finally, appellant contends by her third point of error that the evidence presented at trial is insufficient to prove the victim's cause of death. With regard to this contention, admittedly in a homicide case the

state carries the burden of proving the cause of death of the victim. *Ray v. State,* 160 Tex.Cr.R. 12, 266 S.W.2d 124, 128 (1954). However, appellant's counsel, in open court and on the record, stated that "there is nothing in question before this jury, before this court, that someone shot Luster, that he is dead, and he is dead from these gunshot wounds."

■ In Texas a party may use a formal judicial admission made by a party opponent as a substitute for evidence, if the statement is clear, definite, and unambiguous. 1A R. Ray, Texas Practice: Law of Evidence § 1127 (3d ed. Supp.1986). The source of a judicial admission may be facts alleged in a pleading, an agreed upon statement of fact, a stipulation, or a formal declaration made in open court by a party or counsel. *Id.* § 1127 (3d ed. 1980). As long as the source of the admission remains unretracted it must be taken as true by the court and the jury. It is binding on the declarant and he cannot introduce evidence to contradict it. *Id.*

■ A similar and related concept is that of judicial estoppel. Unlike the familiar doctrine of equitable estoppel, judicial estoppel is not grounded on elements of detrimental reliance or injury in fact. Instead, judicial estoppel "arises from positive rules of procedure based on justice and sound public policy." It effectively estopps a party who has taken a position in an earlier proceeding from taking a contrary position at a later time. *Long v. Knox,* 155 Tex. 581, 291 S.W.2d 292, 295 (1956).

■ The record shows that counsel objected to the prosecutor's introduction of evidence and made his statement that there was no question as to the victim's cause of death. Such a statement qualifies as an unretracted judicial admission, and for this reason, appellant is estopped to now maintain that the state did not satisfactorily show the cause of death of the victim. Point three is overruled.

Accordingly, the judgment is affirmed.